**HEMPEL v. WEEDIN, Com'r of Immigration.**

District Court, W. D. Washington, N. D. January 23, 1928.

No. 12043.

**1. Aliens ⊂=53—German citizen of Prussia held not subject to deportation because of crime involving moral turpitude in Prussia, which was fully pardoned before he entered United States (Immigration Act § 19 [8 USCA § 155]).**

Immigration Act Feb. 5, 1917, § 19 (8 USCA § 155), does not subject to deportation German citizen of Prussia, convicted of crime involving moral turpitude in Prussia and fully pardoned before entering United States, in view of probability that like comity would be shown by Germany in case of our nationals found in that country, under Prussian Treaty of May 1, 1828 (8 Stat. 378).

**2. Pardon ⊂=9—Congress may deny full effect to foreign pardon.**

Though Congress has no power to deny full effect to presidential pardon, it has such power as to foreign pardon.

**3. Pardon ⊂=9—Pardon reaches both punishment prescribed for offense and guilt of offender.**

While pardon is executive act, it affects judgment and sentence, since it reaches both punishment prescribed for offense and guilt of offender.

**4. Aliens ⊂=53—Statute, providing for deportation of alien convicted prior to entry of felony involving moral turpitude, should be construed unaffected by proviso relative to pardons (Immigration Act, § 19 [8 USCA § 155]).**

Immigration Act Feb. 5, 1917, § 19 (8 USCA § 155), providing for deportation of alien convicted prior to entry of crime involving moral turpitude, is to be construed unaffected by proviso relative to inapplicability of provisions in case of pardon, since such proviso was to show

absence of intent to interfere with presidential prerogative to pardon.

**5. Pardon ⊂=4—Right to pardon is coextensive with right to punish.**

The right of pardoning is coextensive with the right of punishment.

**6. Aliens ⊂=46—Prussian Treaty of May 1, 1828, and immigration laws regulate right of German citizen of Prussia to enter and sojourn in United States (8 Stat. 378).**

Prussian Treaty of May 1, 1828 (8 Stat. 378), between United States and Germany, as modified by our immigration laws, regulates right of German citizen of Prussia to enter and sojourn in United States.

**7. Pardon ⊂=9—After pardon, person has same right as other citizens so far as laws of his country are concerned.**

German citizen of Prussia, who was convicted in Prussia of crime involving moral turpitude and subsequently pardoned, had same right after pardon as any other citizen of his country so far as laws of such country were concerned.

**8. Aliens ⊂=40—Treaties ⊂=8—Immigration statute and Prussian Treaty of May 1, 1828, should, if possible, be construed to give effect to both (8 USCA; 8 Stat. 378).**

Immigration Act (8 USCA) and Prussian Treaty of May 1, 1828, (8 Stat. 378), should, if possible, be construed so that both can stand together and be given effect.

Habeas Corpus. Petition by Eric Paul Hans Hempel for a writ to be directed to Luther Weedin, United States Commissioner of Immigration, District No. 28. Petitioner on record held entitled to discharge.

Patterson & Ross, of Seattle, Wash., for petitioner.

Thos. P. Revelle, U. S. Atty., and Anthony Savage, Asst. U. S. Atty., both of Seattle, Wash., for respondent.

CUSHMAN, District Judge. In April, 1927, petitioner was, upon a warrant of the Assistant Secretary of Labor, arrested, the charge being that he was found in the United States in violation of the Immigration Act of February 5, 1917 (8 USCA). In May, after a hearing conducted by an immigrant inspector in which the only testimony taken was that of the petitioner, his deportation was recommended. In June a board of review made the following recommendation:

" * * * This alien, male, aged 37, married, native and citizen of Germany, of the German race, arrived at New York November 16, 1923, ex S. S. President Roosevelt, and was admitted on primary inspection. He has been released on bond. Alien was granted a hearing at Seattle, Washing-

ton, May 4, 1927, by Immigrant Inspector Joseph H. Gee.

"This case came to the attention of the Immigration Service through information by a representative of the staff of the German Consul General at Seattle, who reports that alien had been convicted of embezzlement in Germany. Alien admits that he was convicted for misappropriating money, but he claims that he restored all the money he took and was pardoned after serving eighteen months. He also claims that he told the American consul in Berlin of his conviction and pardon prior to the issuance of his visé. Even though the alien's statement that he has been pardoned be true, yet, under the decision of the court in the case of United States ex rel. Palermo v. Smith, 17 F.(2d) 534, the alien is subject to deportation. In the case cited, the Circuit Court of Appeals held that that part of section 19 of the Immigration Act of 1917 exempting from deportation those aliens who had been convicted of crimes involving moral turpitude and were later pardoned only applied to aliens who had been convicted in this country and pardoned. In view of this fact, and the admission of the alien that he has been convicted abroad, deportation appears mandatory.

"Considered and recommended that alien be deported to Germany at the expense of the steamship company, on the grounds: That he is in the U. S. in violation of the Act of February 5, 1917, in that he has been convicted of or admits having committed a felony or other crime or misdemeanor involving moral turpitude prior to entry into the United States, to wit, theft; and that he was a person likely to become a public charge."

[1] Upon the foregoing report petitioner's deportation was ordered by the assistant to the Secretary. A rehearing was asked by the petitioner to introduce documentary evidence of his pardon of the offense committed by him in Germany, which rehearing was denied, and the petitioner is held for deportation. Upon the return of the order to show cause why a writ of habeas corpus should not issue discharging petitioner, a certificate showing full pardon of such offense was introduced. The fact of such pardon has not been questioned. The sole question for decision, is as to the effect of the pardon. This is shown by the recommendation of the board of review. Comp. St. § 4289¼jj (8 USCA § 155), provides for the deportation of:

" * * * Except as hereinafter provided, any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States, or who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committed at any time after entry; * * * any alien who was convicted, or who admits the commission, prior to entry, of a felony or other crime or misdemeanor involving moral turpitude. * * * "

The second proviso of section 19 of the Immigration Act of February 5, 1917, 39 Stat. at Large, c. 29, pp. 874, 889, 890 (Comp. Stat. Supp. 1919, § 4289¼jj), provides:

" * * * Provided further, that the provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned, nor shall such deportation be made or directed if the court, or judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence or within thirty days thereafter, due notice having first been given to representatives of the state, make a recommendation to the Secretary of Labor that such alien shall not be deported in pursuance of this act."

Respondent's contention is:

" * * * The entire context of the second proviso shows plainly that it relates solely to aliens convicted of crimes committed after entry into the United States, and has no application to the tenth clause of the section. In this connection attention is invited to the opinion of the Circuit Court of Appeals for the Second Circuit, in the case of United States ex rel. Palermo v. Smith, decided February 7, 1927, 17 F.(2d) 534."

Petitioner cites Mast v. Stover, etc., 177 U. S. 485, 20 S. Ct. 708, 44 L. Ed. 856, 858; 20 R. C. L. 558; Ex parte Garland, 4 Wall. 333, 18 L. Ed. 366; Young v. United States, 97 U. S. 39, 24 L. Ed. 992; Ill. Central R. Co. v. Bosworth, 133 U. S. 92, 10 S. Ct. 231, 33 L. Ed. 550; Jones v. Alcorn County, 56 Miss. 766, 31 Am. Rep. 385; Rison v. Farr, 24 Ark. 161, 87 Am. Dec. 52; Hilton v. Guyot, 159 U. S. 113, 16 S. Ct. 139, 40 L. Ed. 95, 108; 29 Cyc. 1565. Respondent cites Ex parte Riley (D. C.) 17 F.(2d) 646; United States ex rel. Palermo v. Smith (C. C. A.) 17 F.(2d) 534.

Full disclosure of petitioner's conviction in Germany, and pardon, it appears, was made by him to the United States consul in Berlin. While the board of review states,

"He (petitioner) also claims that he told the American consul in Berlin of his conviction and pardon, prior to the issuance of his visé," the fact that he did so does not appear to be seriously questioned. The testimony given after his arrest concerning this matter is detailed, specific, and withal convincing. In this testimony he states that he furnished the American consul in Berlin a police certificate relating to his conviction. While he does not so state, it is to be concluded that the record of his pardon was covered by the certificate; otherwise it does not appear reasonable that he would have obtained the visé. The pardon shows that petitioner was sentenced by the Circuit Court of Frankfurt A/Oder. It is also to be noted that on June 17, thirteen days before the date of the board's recommendation, that Commissioner Weedin wrote the Commissioner General of Immigration:

"If any official document having reference to the matter was filed with the American consul, it is probably attached to the immigration visé, which should be in the files of the Naturalization Bureau at Washington, and to which reference may be had if the point is considered material."

There has been no showing that such papers as those mentioned were not attached to the "immigration" visé.

As stated by the board, the decision in Palermo v. Smith, holds that that part of section 19 of the act in question only applies to aliens convicted in the United States. The court, at page 535 of the report, says:

" * * * The question with us is merely one of construction of the statute, and we construe it to mean that a pardon is of assistance to the alien only when the crime of which he is pardoned was committed within the five-year period after entry into the country."

The question of the effect of such a pardon, in the absence of such statute, is not therein considered by the court. In Ex parte Garland, 71 U. S. (4 Wall.) 380, 18 L. Ed. 366, it is said:

"This power of the President is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any class of offenders. The benign prerogative of mercy reposed in him cannot be fettered by any legislative restrictions."

In this case it was also said:

" * * * The Constitution provides that the President 'shall have power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment.' The power thus conferred is unlimited, with the exception stated. It extends to every offense known to the law, and may be exercised at any time after its commission either before legal proceedings are taken or during their pendency or after conviction and judgment. * * *

"Such being the case the inquiry arises as to the effect and operation of a pardon, and on this point all the authorities concur. A pardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.

"There is only this limitation to its operation: It does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment. * * *

"The effect of this pardon is to relieve the petitioner from all penalties and disabilities attached to the offense of treason, committed by his participation in the Rebellion. So far as that offense is concerned, he is thus placed beyond the reach of punishment of any kind. But to exclude him, by reason of that offense, from continuing in the enjoyment of a previously acquired right, is to enforce a punishment for that offense notwithstanding the pardon. If such exclusion can be effected by the exaction of an expurgatory oath covering the offense, the pardon may be avoided, and that accomplished indirectly which cannot be reached by direct legislation. It is not within the constitutional power of Congress thus to inflict punishment beyond the reach of executive clemency. From the petitioner, therefore, the oath required by the Act of January 24, 1865, could not be exacted, even if that act were not subject to any other objection than the one thus stated."

In Burdick v. United States, 236 U. S. 79, 35 S. Ct. 267, 59 L. Ed. 476, it was held that the acceptance of a pardon was essential to its validity, but it has been held this is not true in all cases. Biddle v. Perovich, 274 U. S. 480, 47 S. Ct. 664, 71 L. Ed. 1161, decided by the Supreme Court May 31, 1927. In the latter case it was said:

"A pardon in our days is not a private

act of grace from an individual happening to possess power. It is a part of the constitutional scheme. When granted it is the determination of the ultimate authority that *the public welfare* will be better served by inflicting less than what the judgment fixed. See ex parte Grossman, 267 U. S. 87, 120, 121, 45 S. Ct. 332, 69 L. Ed. 527, 38 A. L. R. 131. Just as the original punishment would be imposed without regard to the prisoner's consent and in the teeth of his will whether he liked it or not, the *public welfare,* not his consent, determines what shall be done. So far as a pardon legitimately cuts down a penalty, it *affects* the *judgment* imposing it. No one doubts that a reduction of the term of an imprisonment or the amount of a fine would limit the sentence effectively on the one side and on the other would leave the reduced term or fine valid and to be enforced, and that the convict's consent is not required." (Italics those of this court.)

In Ex parte Grossman, 267 U. S. 87, 45 S. Ct. 332, 69 L. Ed. 527, 38 A. L. R. 131, in holding that the President may pardon a criminal contempt, it is said:

" * * * The executive can reprieve or pardon all offenses after their commission, either before trial, during trial or after trial, by individuals, or by classes, conditionally or absolutely, and this without modification or regulation by Congress. Ex parte Garland, 4 Wall. 333, 380, 18 L. Ed. 366. * * *

"Executive clemency exists to afford relief from undue harshness or evident mistake in the operation or enforcement of the criminal law. The administration of justice by the courts is not necessarily always wise or certainly considerate of circumstances which may properly mitigate guilt. To afford a remedy, it has always been thought essential in popular governments, as well as in monarchies, to vest in some other authority than the courts power to ameliorate or avoid particular criminal judgments. It is a check intrusted to the executive for special cases. * * * "

In Knote v. United States, 95 U. S. 149, at pages 153 and 154 (24 L. Ed. 442), it was said:

"The effect of a pardon upon the condition and rights of its recipient have been the subject of frequent consideration by this court; and principles have been settled which will solve the question presented for our determination in the case at bar. Ex parte Garland, 4 Wall. 333 [18 L. Ed. 366]; Armstrong's Foundry, 6 Wall. 766 [18 L. Ed. 882]; United States v. Padelford, 9 Wall.

531 [19 L. Ed. 788]; United States v. Klein, 13 Wall. 128 [20 L. Ed. 519]; Armstrong v. United States, 13 Wall. 155 [20 L. Ed. 614]; Pargoud v. United States, 13 Wall. 156 [20 L. Ed. 646]; Carlisle v. United States, 16 Wall. 147 [21 L. Ed. 426]; Osborn v. United States, 91 U. S. 474 [23 L. Ed. 388].

"A pardon is an act of grace by which an offender is released from the consequences of his offense, so far as such release is practical and within control of the pardoning power, or of officers under its direction. It releases the offender from all disabilities imposed by the offense, and restores to him all his civil rights. In contemplation of law, it so far blots out the offense, that afterwards it cannot be imputed to him to prevent the assertion of his legal rights. It gives to him a new credit and capacity, and rehabilitates him to that extent in his former position. But it does not make amends for the past."

See, also, Ill. Central R. v. Bosworth, 133 U. S. 92, 10 S. Ct. 231, 33 L. Ed. 550.

[2] While Congress has no power to deny full effect to a presidential pardon, it, of course, has such power as to a foreign pardon. The question in the present case is, Has Congress shown an intent to do so? There therefore remains for consideration the question of the effect accorded by international law to petitioner's pardon in Germany. In Hilton v. Guyot, 159 U. S. 113, 163 and 164, 16 S. Ct. 139, 143 (40 L. Ed. 95), it was said:

"International law, in its widest and most comprehensive sense, including not only questions of right between nations, governed by what has been appropriately called the law of nations; but also questions arising under what is usually called private international law, or the conflict of laws, and concerning the rights of persons within the territory and dominion of one nation, by reason of acts, private or public, done within the dominions of another nation—is part of our law, and must be ascertained and administered by the courts of justice, as often as such questions are presented in litigation between man and man, duly submitted to their determination. The most certain guide, no doubt, for the decision of such questions is a treaty or a statute of this country. But when, as is the case here, there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is, whenever it becomes necessary to do so, in order to determine the rights of parties to suits regularly brought before them. In doing this the courts

must obtain such aid as they can from judicial decisions, from the works of jurists and commentators, and from the acts and usages of civilized nations. Fremont v. United States, 17 How. 542, 557 [15 L. Ed. 241]; The Scotia, 14 Wall. 170, 188 [20 L. Ed. 822]; Republica v. De Longchamps, 1 Dall. 111, 116 [1 L. Ed. 59]; Moultrie v. Hunt, 23 N. Y. 394, 396. No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, whether by *executive order,* by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations.' Although the phrase has been often criticized, no satisfactory substitute has been suggested. 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, *executive* or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws. * * *" (Italics those of this court.)

In the present case, the court's attention has not been directed to any treaty provision touching this identical question, or text-writer discussing it.

In Bank of Augusta v. Earle, 13 Pet. 519, at 589 (10 L. Ed. 274), the court said:

"* * * The comity thus extended to other nations, is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered; and is inadmissible when contrary to its policy, or prejudicial to its interests. But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong, that courts of justice have continually acted upon it, as a part of the voluntary law of nations. It is truly said, in Story's Conflict of Laws, 37, that *'in the silence of any positive rule, affirming or denying, or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy, or prejudicial to its interests.* It is not the comity of the courts, but the comity of the nation, which is administered, and ascertained in the same way, and guided by the same reasoning by which all other principles of municipal laws are ascertained and guided.'" (Italics those of this court.)

In Hilton v. Guyot, supra, page 166 (16 S. Ct. 144), the following from Wheaton is quoted with approval:

"* * * 'All the effect, which foreign laws can have in the territory of a state, depends absolutely on the express or tacit consent of that state.' 'The express consent of a state, to the application of foreigners within its territory, is given by acts passed by its legislative authority, or by treaties concluded with other states. Its tacit consent is manifested by the decisions of its judicial and *administrative authorities,* as well as by the writings of its publicists. * * *'" (Italics those of this court.)

At page 167 (16 S. Ct. 145) it is said:

"A judgment affecting the status of persons, such as a decree * * * dissolving a marriage, is recognized as valid in every country, unless contrary to the policy of its own law. Cottington's Case, 2 Swanston, 326; Roach v. Garvan, 1 Ves. Sen. 157; Harvey v. Farnie, 8 App. Cas. 43; Cheely v. Clayton, 110 U. S. 701 [4 S. Ct. 328, 28 L. Ed. 298]. It was of a foreign sentence of divorce, that Lord Chancellor Nottingham, in the House of Lords, in 1688, in Cottington's Case, above cited, said: 'It is against the law of nations not to give credit to the judgments and sentences of foreign countries, till they be reversed by the law, and according to the form of those countries wherein they were given. For what right hath one kingdom to reverse the judgment of another? And how can we refuse to let a sentence take place till it be reversed? And what confusion would follow in Christendom, if they should serve us so abroad, and give no credit to our sentences.'"

At page 214 (16 S. Ct. 163) it is said:

"Mr. Justice Cooley said: 'True comity is equality; we should demand nothing more, and concede nothing less.' McEwan v. Zimmer, 38 Mich. 765, 769 [31 Am. Rep. 332]."

After a review of the laws and decisions of various countries of the two Americas, of Europe, and those of Egypt, it was said by the court, at page 227 (16 S. Ct. 168):

"It appears, therefore, that there is hardly a civilized nation on either continent, which, by its general law, allows conclusive effect to an executory foreign judgment for the recovery of money. In France, and in a few smaller States—Norway, Portugal, Greece, Monaco, and Hayti—the merits of the controversy are reviewed, as of course, allowing to the foreign judgment, at the most, no more effect than of being prima

facie evidence of the justice of the claim. In the great majority of the countries on the continent of Europe—in Belgium, Holland, Denmark, Sweden, Germany, in many cantons of Switzerland, in Russia and Poland, in Roumania, in Austria and Hungary (perhaps in Italy), and in Spain—as well as in Egypt, in Mexico, and in a great part of South America, the judgment rendered in a foreign country is allowed the same effect only as the courts of that country allow to the judgments of the country in which the judgment in question is sought to be executed.

"The prediction of Mr. Justice Story (in section 618 of his Commentaries on the Conflict of Laws, already cited) has thus been fulfilled, and the rule of reciprocity has worked itself firmly into the structure of international jurisprudence. The reasonable, if not the necessary, conclusion appears to us to be that judgments rendered in France, or in any other foreign country, by the laws of which our own judgments are reviewable upon the merits, are not entitled to full credit and conclusive effect when sued upon in this country, but are prima facie evidence only of the justice of plaintiffs' claim."

The decision in this case was rendered in 1895. It will be seen from the foregoing decision that, as to judgments, a different rule prevails in France than in Germany. In Hilton v. Guyot, supra, the effect to be given to a judgment recovered in France, in a suit between private parties, was the matter being considered by the court. Speaking of the German rule, the court said (page 219 [16 S. Ct. 164]):

"In the Empire of Germany, as formerly in the states which now form part of that Empire, the judgment of those states are mutually executed; and the principle of reciprocity prevails as to the judgments of other countries. * * *

"By the German Code of 1887, 'compulsory execution of the judgment of a foreign court cannot take place, unless its admissibility has been declared by a judgment of exequatur;' 'The judgment of exequatur is to be rendered without examining whether the decision is conformable to law;' but it is not to be granted 'if reciprocity is not guaranteed.' * * *

"The Reichsgericht, or Imperial Court, in a case reported in full in Piggott, has held that an English judgment cannot be executed in Germany, because, the court said, the German courts, by the Code, when they execute foreign judgments at all, are 'bound to the unqualified recognition of the legal validity of the judgments of foreign courts,' and 'it is therefore an essential requirement of reciprocity, that the law of the foreign state should recognize in an equal degree the legal validity of the judgments of German courts, which are to be enforced by its courts; and that an examination of their legality, both as regards the material justice of the decision as to matters of fact or law, and with respect to matters of procedure, should neither be required as a condition of their execution, by the court ex officio, nor be allowed by the admission of pleas which might lead to it.' * * * *"

[3] As already pointed out, the court, in considering the scope and application of the rule or practice as to comity of nations, makes no distinction between judgments rendered by the courts of other nations and the executive acts and administrative decrees of the authorities of such nations (pages 164 and 165 [16 S. Ct. 139]); while a pardon is an executive act, it affects the judgment and the sentence; for, as stated in Ex parte Garland, supra, the pardon reaches "both the punishment prescribed for the offense, and the guilt of the offender."

In Second Russian Ins. Co. v. Miller, 268 U. S. 552, at 560, 45 S. Ct. 593, 596 (69 L. Ed. 1088), a Russian ukase was being considered, and, while it was denied effect in the particular case, the decision in no way limits any of the foregoing decisions. The reason for denying effect to it is stated as follows:

" * * * Certainly such an application of foreign law to acts done within the territorial jurisdiction of the forum carries the principle of the adoption of foreign law by comity much beyond its limits as at present defined, the more so as the contract between a Russian and a German which we are asked to hold illegal on the basis of Russian law is shown by the expert testimony in the case to be valid according to the German law. The contention runs counter to the reasoning of such cases. * * *"

Among the authorities cited by the court in support of its ruling were included the case of Bank of Augusta v. Earle and Hilton v. Guyot, supra. See, also, the following: Gioe v. Westervelt et al. (C. C.) 116 F. 1017; Strauss v. Conried (C. C.) 121 F. 199; Compagnie du Port de Rio de Janeiro v. Mead, etc., Co. (D. C.) 19 F.(2d) 163.

In Carlesi v. New York, 233 U. S. 51, 34 S. Ct. 576, 58 L. Ed. 843, the question was as to the effect of a pardon by the President, where the defendant in a state court had been convicted and sentenced as for a second offense, despite the pardon. The question was

whether the state statute imposed an additional punishment for a crime of which defendant had been convicted and pardoned. The Supreme Court considered itself bound by the construction of the state statute, that it did not, and held that the pardon did not prevent the application of the state statute in the case of a second offense.

[4] The second proviso of section 19, to the effect that the provision respecting deportation should not apply to one who had been pardoned, it has been contended that, it having been held that this provision was limited to pardoned offenders committing crimes after entry into the United States, therefore an intent is shown by the proviso to exclude and deport those convicted prior to entry of offenses involving moral turpitude, whether pardoned or not. It is no doubt true that one of the surest ways of indicating the scope and meaning of a statute is by exception or proviso—that is, by taking out of an enactment what otherwise would have been included. But this rule of construction presupposes the effectiveness of the exception or proviso. If in fact this proviso saved from deportation an alien convict, pardoned by the President, then it might plausibly be argued that an intent was shown to deport a foreign convict, in spite of his pardon.

As above pointed out, it was held in Ex parte Garland that Congress can neither limit the effect of a presidential pardon, "nor exclude from its exercise any class of offenders." It must therefore be concluded that this proviso was the result of pains taken by Congress to show that there was no intent to interfere in any way with the presidential prerogative to fully pardon, rather than the assumption of power on the part of Congress to deport a pardoned convict, that is, a power asserted by disclaiming a present purpose to exercise it. The taking of such care manifests no intent to deny effect to the pardon of a foreign executive. The statute is therefore to be construed unaffected by this proviso. It subjects to deportation "any alien who was convicted of or admits the commission, prior to entry, of a felony or other crime or misdemeanor involving moral turpitude."

[5] The reference to the admission of the commission of a crime contemplates an admission where there has been no conviction. The right of pardoning is coextensive with the right of punishment. If, upon a review by an appellate court, petitioner's conviction had been reversed, no one would contend that it was the conviction meant by the statute,

although it would fall within the letter of the act.

A pardon avoids a sentence, sometimes because of mistakes at the trial, and sometimes because of reasons that a court cannot entertain.

[6] In a decision in 1908 (Disconto Gesellschaft v. Umbreit, 208 U. S. 570, 28 S. Ct. 337, 52 L. Ed. 625), the Supreme Court assumed the following from the Prussian Treaty of 1828 (8 Stat. 378) to be in effect between the United States and Germany:

" * * * There shall be between the territories of the high contracting parties, a reciprocal liberty of commerce and navigation. The inhabitants of their respective states shall, mutually, have liberty to enter the ports, places, and rivers of the territories of each party, wherever foreign commerce is permitted. They shall be at liberty to sojourn and reside in all parts whatsoever of said territories, in order to attend to their affairs, and they shall enjoy, to that effect, the same security and protection as natives of the country wherein they reside, on condition of their submitting to the laws and ordinances there prevailing."

[7] After his pardon, petitioner had the same right so far as the laws of his country were concerned, as any other of its citizens. The treaty with Prussia was made before the Empire, and the above decision was rendered before the World War and the Republic's succession to the Empire. The court knows of no writing elsewhere evidencing the right of our nationals to enter and sojourn in Prussia than this treaty, which, as modified by our immigration laws, regulates the right of German citizens of Prussia to enter and sojourn in the United States.

After the War of 1812, in considering the effect that that war had upon the treaty with Great Britain made at the close of the Revolution, it was said by the Supreme Court, in Society for the Propagation of the Gospel v. New Haven, 8 Wheat. 464, at 494 (5 L. Ed. 662):

" * * * But we are not inclined to admit the doctrine urged at the bar, that treaties become extinguished, ipso facto, by war between the two governments, unless they should be revived by an express or implied renewal on the return of peace.

"Whatever may be the latitude of doctrine laid down by elementary writers on the law of nations, dealing in general terms, in relation to this subject, we are satisfied, that the doctrine contended for is not universally true. There may be treaties of such a na-

ture, as to their object and import, as that war will put an end to them; but where treaties contemplate a permanent arrangement of territorial, and other national rights, or which, in their terms, are meant to provide for the event of an intervening war, it would be against every principle of just interpretation, to hold them extinguished by the event of war. If such were the law, even the Treaty of 1783, so far as it fixed our limits, and acknowledged our independence, would be gone, and we should have had again to struggle for both upon original revolutionary principles. Such a construction was never asserted, and would be so monstrous as to supersede all reasoning. We think, therefore, that treaties stipulating for permanent rights, and general arrangements, and professing to aim at perpetuity, and to deal with the case of war as well as of peace, do not cease on the occurrence of war, but are, at most, only suspended while it lasts; and unless they are waived by the parties, or new and repugnant stipulations are made, they revive in their operation at the return of peace. * * *"

[8] While the treaty of 1828 did not deal with the case of war, and while it did not profess to aim at perpetuity, it did authorize the doing of acts that were bound to result in enduring interests and relations. The petitioner, since residing in the United States, has married, and at the time of his arrest was living with his wife in Seattle. A statute and a treaty should, if possible, be construed so that both can stand together, and be given effect. United States v. Gue Lim, 176 U. S. 459, 20 S. Ct. 415, 44 L. Ed. 544; Chew Heong v. United States, 112 U. S. 536, 5 S. Ct. 255, 28 L. Ed. 770; Cheung Sum Shee v. Nagle, 268 U. S. 336, 45 S. Ct. 539, 69 L. Ed. 985. See, also, Powers v. Comly, 101 U. S. 789, 25 L. Ed. 805, and in the matter of Lum Poi and Ng Shee (No. 12058) 23 F.(2d) 690, of the causes in this court, a decision rendered January 12, 1928.

The court, in Hilton v. Guyot, supra, points out a recognition accorded by Germany to foreign judgments, greater than that in certain other countries. The American consul at Berlin, who viséed petitioner's passport, was obviously in a better position to know the extent to which the German government would reciprocate in such a matter, than was the board of review, and the province of determining such a question pertains nearer to the office of the consul than that of the board.

A reason that may have induced Congress not to define the effect of a foreign pardon

is: There are foreign nations whose governments, laws, and civilization are similar to our own, and there are others which are not. There are countries that, though their governments and civilization may be similar to ours, differ in matters of policy as to the recognition of acts by the authorities of other nations, analogous to those here in question. Some of these differences are pointed out above in the quotations from the opinion in Hilton v. Guyot. The principle of reciprocity in such matters is adopted and approved by the Supreme Court in that case; such matters are a part of international law, which it is the province of the courts to determine.

Section 19 of the Immigration Act does not subject to deportation a German citizen of Prussia, convicted of a crime involving moral turpitude, in Prussia, and fully pardoned before entering the United States; as it appears probable that a like comity would be shown by Germany in the case of our nationals found in that country.

As the record now stands, the petitioner should be discharged from custody. The order will be settled upon notice.