## WALLACH ET AL. *v.* VAN RISWICK.

1. The act of July 17, 1862 (12 Stat. 589), is an act for the confiscation of enemies' property, and it provides for the seizure and condemnation of all their estate. When it has been carried into effect by appropriate proceedings in any given case, the offender has no longer any interest or ownership in the thing forfeited which he can convey, or any power over it which he can exercise in favor of another.

2. The joint resolution of even date with that act was designed only to qualify, and not defeat it. The provision therein, that "no proceedings shall work a forfeiture beyond the life of the offender," obviously means that they shall not affect the ownership of the land after the termination of his natural life; and that, after his death, it shall pass and be owned as if it had not been forfeited. It was intended for the exclusive benefit of his heirs, and to enable them to take the inheritance after his death.

3. The maxim, that a fee cannot be in abeyance, is not of universal application;

nor has it any weight in an inquiry as to the intent and effect of said act and joint resolution.

4. The amnesty proclamation of the President of the United States of Dec. 25, 1868, did not give back property which had been sold under the Confiscation Act, or any interest in it, either in possession or expectancy.

5. *Day* v. *Micou*, 18 Wall. 156, and *Bigelow* v. *Forrest*, 9 id. 339, cited and explained.

APPEAL from the Supreme Court of the District of Columbia.

The complainants are children and heirs-at-law of Charles S. Wallach, who was an officer in the Confederate army during the late rebellion. While he was thus in that service, his real estate situate in the city of Washington was, by order of the President, seized under the Confiscation Act of July 17, 1862, and a libel for its condemnation duly filed. The lot of ground, respecting which the present controversy exists, was condemned as forfeited to the United States on the twenty-ninth day of July, 1863; and, on the ninth day of September next following, it was sold under a writ of *venditioni exponas*, the defendant Van Riswick becoming the purchaser. Prior to the seizure, the lot had been conveyed by Charles S. Wallach in trust to secure the payment of a promissory note for $5,000 which he had borrowed; and, at the time of the seizure, a portion of this debt remained unpaid and due to the defendant, to whom the note and the security of the deed of trust had been assigned. Wallach's interest in the property was, therefore, an equity of redemption; and, by the confiscation sale, the purchaser acquired that interest, and held it with the security of the deed of trust given to protect the payment of the promissory note. On the 3d of February, 1866, Wallach, having returned to Washington, made a deed purporting to convey the lot in fee-simple with covenants of general warranty to Van Riswick, the purchaser at the confiscation sale. His wife joined with him in the deed.

So the case stood until Feb. 3, 1872, when Wallach died. The complainants then filed this bill, claiming, that after the seizure, condemnation, and sale of the land, as the property of a public enemy engaged in the war of the rebellion, nothing remained in him that could be the subject of sale or conveyance; consequently, that nothing passed by the deed from Wallach and wife; and that they, being his heirs, had, upon his

death, an estate in the land, and a right to redeem, and to have the conveyance of their father to Van Riswick declared to be no bar to their redemption. The relief sought is redemption of the deed of trust; discovery (particularly of the amount remaining due upon Charles S. Wallach's note), an account of the rents and profits of the land since the death of Wallach, a decree that his deed of Feb. 3, 1867, is of no effect as against the plaintiffs, a decree for delivery of possession of the lot, and general relief.

To this bill the defendant Van Riswick demurred generally; and the court below sustained the demurrer, and dismissed the bill. Hence this appeal.

*Mr. Albert Pike* and *Mr. L. H. Pike* for the appellants.

Wallach's conveyance passed nothing. By the seizure and condemnation, all his estate vested in the United States.

The forfeiture is the same as that incurred by the tenant in the olden time who had violated his obligation of homage and fealty. If, at his death, his heirs were permitted to take, it was not because of any right in them, but out of grace and favor.

The whole estate of the offender vested in the crown in case of forfeiture. *Brown* v. *Waite*, 2 Mod. 130.

Congress, by the act of July 17, 1862, intended to take the whole estate, but, exercising by the joint resolution the discretion and grace which in England belonged to the king, caused it, at the offender's death, to pass to his heirs.

The act re-enacted the old English law in all its rigor. The joint resolution did not propose to do more than apply the constitutional saving. By virtue of it, the heirs, at the death of the ancestor, take the whole fee from the United States as by grant, and yet also as heirs by descent, the statute making to that end a new rule of law.

The declared purpose to " punish treason," and to " confiscate the property of rebels," would be defeated if the fee of the confiscated land were subject to the disposal of its rebel owner. It was seized as enemy property, because that enemy was a rebel. But, inasmuch as he was a citizen of the United States, President Lincoln was right in maintaining that the Constitution forbade a perpetual forfeiture of the property.

The words, "during the life of the person attainted," where they
occur, so far from confining the forfeiture to his life-estate,
leaving in him the fee, unquestionably mean, that whilst all
his interest in, or alienating power over, the land, shall, during
his life, be absolutely forfeited and extinguished, his treason
shall not work the disinherison of the children.

If it were necessary to give effect to the act and joint reso-
lution, the court would consider the forfeiture equivalent, by
virtue of the law, to a conveyance by Wallach to the United
States, to their use during his life, and to that of his heirs after
his death.

The joint resolution is virtually a covenant to stand seized to
uses.

Forfeiture is a kind of alienation. *Brown* v. *Waite, supra.*

The proceedings in question vested the whole estate and
property of Wallach, in the land, in the United States. As,
under an act of attainder, with a saving in favor of all others
than the attainted party and his heirs, " the saving *removed*
the fee-simple out of the person of the king, and *conveyed* it to
the third person whose right was saved, so that he could have
it by means of the saving, for it was in the king when the con-
dition was performed, and it must go out of him to the person
by the condition and by the saving; " so the whole fee was
vested in the United States, and, at the death of Wallach, was
*removed* out of the United States by the condition and saving
in the joint resolution, and was thereby *conveyed* to his heirs.
*Lord Lovel's Case,* Plowd. 488.    See, further, History and Pro-
ceedings of the House of Lords, vol. ii. p. 261; Foster's Crown
Law, 222; *Thornby* v. *Fleetwood,* 1 Comyns, 207; *Lord de la
Warre's Case,* 11 Co. 1 *b; Earl of Derby's Case,* 1 Ld. Raym.
355; *Thornby* v. *Fleetwood,* Str. 363; *Wheatly* v. *Thomas,* 1 Lev.
74; *Burgess* v. *Wheate,* Eden, 128; *Sheffield* v. *Ratcliffe,* Hob.
335 *b;* 6 Hansard, Parl. Hist. 796; 2 Burnet, Hist. of His
Own Times, 837, 838; 3 Macaulay, Hist. of Eng. 241, 242;
*Dowtee's Case,* 3 Coke, 10; *Page's Case,* 5 id. 52; *The Lord
Advocate* v. *Gordon,* 1 Craigie, 508.

Mr. *T. J. Durant* and Mr. *T. A. Lambert* for the appellee.

1. The bill is multifarious in this, that it asserts, 1st, Equity
for an account, and to redeem from the operation of the deed

of trust of Sept. 28, 1854; 2d, Right to a rescission of the
deed or so-called mortgage of Feb. 3, 1866, and to an avoidance
of the sale of Aug. 23, 1867; and, 3d, Claim for the posses-
sion of the land, by virtue of an alleged settlement created by
the act of July 17, 1862, in favor of the complainants, as the
right heirs of Charles S. Wallach.    Story, Eq. Pl., sects. 476,
530; *Loker* v. *Rolle*, 3 Ves. 4, 343.

2. This court has expressly declared, in passing upon the act
and joint resolution which govern this case, that all " which
could become the property of the United States was a right to
the property seized, terminating with the life of the person for
whose act it had been seized." *Bigelow* v. *Forrest*, 9 Wall.
339; cited and confirmed in *Day* v. *Micou*, 18 id. 156.    The
proceedings in confiscation, therefore, carved a life-estate out
of the fee, leaving the latter vested where it had abided before
they were instituted.    No disability was, or could constitution-
ally be, imposed upon Wallach, incapacitating him from con-
veying the fee subject to his forfeited life-estate.

3. Under the decisions of this court, the fee did not for any
purpose vest in the United States.    It must remain somewhere.
The doctrine of a fee in abeyance, or *in gremio legis*, or *in
nubibus*, is not now the law of real property.    Fearne on Cont.
Rem., 351, 361; Wms. on Real Prop., 256; 1 Brown & Hud-
ley's Com., 547.    If, however, Wallach had, after the proceed-
ings in question, no seisin of the inheritance, the heirs cannot
take by descent.

4. Under the amnesty proclamation of Dec. 25, 1868, Wal-
lach was completely restored to the enjoyment of his rights of
property and person, however they may have been suspended
by the rebellion, except in those cases where his property had
by judicial proceedings vested in other persons.    *Brown* v.
*United States*, 2 Kan. 230.    Whether he be regarded, there-
fore, as never having lost his entire estate in his landed prop-
erty, or as having been restored to its possession by virtue of
amnesty, his deed to Van Riswick was sufficient to convey the
title in fee to the lot in controversy.    Its covenants of war-
ranty, general and special, are binding upon his heirs.    If
executed before the restoration of his title, the latter are
estopped, equally as he would have been in his lifetime, from

questioning its operative force and effect.   This familiar principle received forcible exposition in *McWilliams* v. *Nesley*, 2 S. & R. 507, 518.

MR. JUSTICE STRONG delivered the opinion of the court.

The formal objections to the bill deserve but a passing notice. It is not, we think, multifarious; and all persons are made parties to it who can be concluded or affected by any decree that may be made, — all persons who have an interest in the subject-matter of the controversy.   The main question raised by the demurrer, and that which has been principally argued, is, whether, after an adjudicated forfeiture and sale of an enemy's land under the Confiscation Act of Congress of July 17, 1862, and the joint resolution of even date therewith, there is left in him any interest which he can convey by deed.

The act of July 17, 1862, is an act for the confiscation of enemies' property.   Its purpose, as well as its justification, was to strengthen the government, and to enfeeble the public enemy by taking from the adherents of that enemy the power to use their property in aid of the hostile cause.   *Miller* v. *United States*, 11 Wall. 268.   With such a purpose, it is incredible that Congress, while providing for the confiscation of an enemy's land, intended to leave in that enemy a vested interest therein, which he might sell, and with the proceeds of which he might aid in carrying on the war against the government. The statute indicates no such intention.   The contrary is plainly manifested.   The fifth section enacted that it should be the duty of the President of the United States to cause the seizure of "*all the estate and property, money, stocks, credits, and effects*," of the persons thereinafter described (of whom Charles S. Wallach was one), and to apply the same and the proceeds thereof to the support of the army of the United States; and it declared that all sales, transfers, and conveyances of any such property should be null and void.   The description of property thus made liable to seizure is as broad as possible.   It covers the estate of the owner, — all his estate or ownership.   No authority is given to seize less than the whole. The seventh section of the act enacted, that to secure the condemnation and sale of any such property (viz., the property

seized), so that it might be made available for the purpose aforesaid, proceedings should be instituted in a court of the United States; and if said property should be found to have belonged to a person engaged in the rebellion, or who had given aid or comfort thereto, the same should be condemned as enemies' property, and become the property of the United States, and might be disposed of as the court should decree, the proceeds thereof to be paid into the treasury of the United States for the purpose aforesaid. Nothing can be plainer than that the condemnation and sale of the identical property seized were intended by Congress; and it was expressly declared that the seizure ordered should be of all the estate and property of the persons designated in the act. If, therefore, the question before us were to be answered in view of the proper construction of the act of July 17, 1862, alone, there could be no doubt that the seizure, condemnation, and sale of Charles S. Wallach's estate in the lot in controversy left in him no estate or interest of any description which he could convey by deed, and no power which he could exercise in favor of another. This we understand to be substantially conceded on behalf of the defendant.

But the act of 1862 is not to be construed exclusively by itself. Contemporaneously with its approval, a joint resolution was passed by Congress, and approved, explanatory of some of its provisions, and declaring that " no proceedings under said act shall be so construed as to work a forfeiture of the real estate of the offender beyond his natural life." The act and the joint resolution are doubtless to be construed as one act, precisely as if the latter had been introduced into the former as a proviso. The reasons that induced the passage of the resolution are well known. It was doubted by some, even in high places, whether Congress had power to enact that any forfeiture of the land of a rebel should extend or operate beyond his life. The doubt was founded on the provision of the Constitution, in sect. 3, art. 3, that " no attainder of treason shall work corruption of blood or forfeiture except during the life of the person attainted." It was not doubted that Congress might provide for forfeitures effective during the life of an offender. The doubt related to the possible duration of

a forfeiture, not to the thing forfeited, or to the extent and efficacy of the forfeiture while it continued. It was to meet the doubt which did exist that the resolution was adopted. What, then, is its effect? and what was intended by it? Plainly it should be so construed as to leave it in accord with the general and leading purpose of the act of which it is substantially a part; for its object was, not to defeat, but to qualify. That purpose, as we have said, was to take away from an adherent of a public enemy his property, and thus deprive him of the means by which he could aid that enemy. But that purpose was thwarted, partially at least, by the resolution, if it meant to leave a portion, and often much the larger portion, of the estate still vested in the enemy's adherent. If, notwithstanding an adjudicated forfeiture of his land and a sale thereof, he was still seized of an estate expectant on the determination of a life-estate which he could sell and convey, his power to aid the public enemy thereby remained. It cannot be said that such was the intention of Congress. The residue, if there was any, was equally subject to seizure, condemnation, and sale with the particular estate that preceded it. It is to be observed, that the joint resolution made no attempt to divide the estate confiscated into one for life, and another in fee. It did not say that the forfeiture shall be of a life-estate only, or of the possession and enjoyment of the property for life. Its language is, "No proceedings shall work a forfeiture beyond the life of the offender;" not beyond the life *estate* of the offender. The obvious meaning is, that the proceedings for condemnation and sale shall not affect the ownership of the property after the termination of the offender's natural life. After his death, the land shall pass or be owned as if it had not been forfeited. Nothing warrants the belief that it was intended, that, while the forfeiture lasts, it should not be complete; viz., a devolution upon the United States of the offender's entire right. The words of the resolution are not exactly those of the constitutional ordinance; but both have the same meaning, and both seek to limit the extent of forfeitures. In adopting the resolution, Congress manifestly had the constitutional ordinance in view; and there is no reason why one should receive a construction different from that given to the other.

What was intended by the constitutional provision is free from doubt. In England, attainders of treason worked corruption of blood and perpetual forfeiture of the estate of the person attainted, to the disinherison of his heirs, or of those who would otherwise be his heirs. Thus innocent children were made to suffer because of the offence of their ancestor. When the Federal Constitution was framed, this was felt to be a great hardship, and even rank injustice. For this reason, it was ordained that no attainder of treason should work corruption of blood or forfeiture, except during the life of the person attainted. No one ever doubted that it was a provision introduced for the benefit of the children and heirs alone; a declaration that the children should not bear the iniquity of the fathers. Its purpose has never been thought to be a benefit to the traitor, by leaving in him a vested interest in the subject of forfeiture.

There have been some acts of Parliament, providing for limited forfeitures, closely resembling those described in the act of Congress as modified by the joint resolution. The statute of 5th Elizabeth, c. 11, " against the clipping, washing, rounding, and filing of coins," declared those offences to be treason, and enacted that the offender or offenders should suffer death, and lose and forfeit all his or their goods and chattels, and also " lose and forfeit all his and their lands and tenements during his or their natural life or lives only." The statute of 18th Elizabeth, c. 1, enacted the same provision " against diminishing and impairing of the queen's majesty's coin and other coins current within the realm," and declared that the offender or offenders should " lose and forfeit to the queen's highness, her heirs and successors, all their lands, tenements, and hereditaments during his or their natural life or lives only." Each of these statutes provided that no attainder under it should work corruption of blood, or deprive the wife of an offender of her dower. The statute of 7 Anne, c. 21, is similar. They all provide for a limited forfeiture, — limited in duration, not in quantity. Certainly no case has been found, none, we think, has ever existed, in which it has been held that either statute intended to leave in the offender an ulterior estate in fee after a forfeited life-estate, or any interest whatever subject to his

disposing power. Indeed, forfeiture has frequently been spoken of in the English courts as equivalent to conveyance. It was in *Lord Lovel's Case*, Plowd. 488, where it was said by Harper, Justice, " The act (of attainder) is no more than an instrument of conveyance, when by it the possessions of one man are transferred over to another." And again: " The act conveys it (the land forfeited) to the king, removes the estate out of Lovel, and vests it entirely in the king." In *Burgess* v. *Wheate*, 1 Eden, 201, in discussing the subject of forfeiture, the Master of the Rolls said, " The forfeiture operated like a grant to the king. The crown takes an estate by forfeiture, subject to the engagements and incumbrances of the person forfeiting. The crown holds in this case as a royal trustee (for a forfeiture itself is sometimes called a royal escheat). . . . If a forfeiture is regranted by the king, the grantee is a tenant *in capite*, and all mesne tenure is extinct." See also *Brown* v. *Waite*, 2 Mod. 133. If a forfeiture is equivalent to a grant or conveyance to the government, how can any thing remain in the person whose estate has been forfeited which he can convey to another? No conceivable reason exists why the construction applied to the English statutes referred to should not be applied to our act of 1862 and the joint resolution. If, in the British statutes, the sole object of the limitation of the duration of forfeiture was a benefit to the heirs of the offender, it is the same in our statutes; and it is a perversion of the intent and meaning of the joint resolution to read it as preserving rights and interests in those who under the act had forfeited all·their estate. What was seized, condemned as forfeited, and sold, in the proceedings against Charles S. Wallach's estate, was not, therefore, technically a life-estate. It is true, that in *Bigelow* v. *Forrest*, 9 Wall. 339, and *Day* v. *Micou*, 18 id. 156, some expressions were used indicating an opinion that what was sold under the confiscation acts was a life-estate carved out of a fee. The language was, perhaps, incautiously used. We certainly did not intend to hold that there was any thing left in the person whose estate had been confiscated. The question was not before us. We were not called upon to decide any thing respecting the quantity of the estate carved out; and what we said upon the subject had reference solely to its duration.

It is argued on behalf of the defendant, that because under a confiscation sale of land, or of estate therein, the purchaser takes an interest terminable with the life of the person whose property has been confiscated, the fee must be somewhere; for it is said that a fee can never be in abeyance; and as the fee cannot be in the United States, they having sold all that was seized, nor in the purchaser, whose interest ceases with the life, it must remain in the person whose estate has been seized. The argument is more plausible than sound. It is a maxim of the common law, that a fee cannot be in abeyance. It rests upon reasons that now have no existence, and it is not now of universal application. But if it were, being a common-law maxim, it must yield to statutory provisions inconsistent with it; and it is, therefore, of no weight in the inquiry what was intended by the Confiscation Act and concurrent resolution. Undoubtedly there are some anomalies growing out of the congressional legislation, as there were growing out of the statutes of 5th and 18th Elizabeth; but it is the duty of the court to carry into effect what Congress intended, though it must be by denying the applicability of some common-law maxims, the reasons of which have long since disappeared. It has not been found necessary in England to hold that a reversion remained in a traitor after his attaint, though the statutes declared that the forfeiture shall be during his natural life only.

We are not, therefore, called upon to determine where the fee dwells during the continuance of the interest of a purchaser at a confiscation sale, whether in the United States or in the purchaser, subject to be defeated by the death of the offender whose estate has been confiscated. That it cannot dwell in the offender, we have seen, is evident; for, if it does, the plain purpose of the Confiscation Act is defeated, and the estate confiscated is subject alike in the hands of the United States and of the purchaser to a paramount right remaining in the offender. If he is a tenant of the reversion, or of a remainder, he may control the use of the particular estate; at least, so far as to prevent waste. That Congress intended such a possibility is incredible.

If it be contended that the heirs of Charles S. Wallach cannot take by descent unless their father, at his death, was seized of

an estate of inheritance, — *e.g.*, reversion, or a remainder, — it may be answered, that, even at common law, it was not always necessary that the ancestor should be seized to enable the heir to take by descent.  Shelley's case is, that, where the ancestor *might* have taken and been seized, the heir shall inherit. Fortescue, J., in *Thornby* v. *Fleetwood*, 1 Str. 318.

If it were true, that, at common law, the heirs could not take in any case where their ancestor was not seized at his death, the present case must be determined by the statute. Charles S. Wallach was seized of the entire fee of the land before its confiscation, and the act of Congress interposed to take from him that seisin for a limited time.  That it was competent to do, attaching the limitation for the benefit of the heirs.  It wrought no corruption of blood.  In *Lord de la Warre's Case*, 11 Coke, 1 *a*, it was resolved by the justices " that there was a difference betwixt disability personal and temporary and a disability absolute and perpetual ; as, where one is attainted of treason or felony, that is an absolute and perpetual disability, by corruption of blood, for any of his posterity to claim any inheritance in fee-simple, either as heir to him, or to any ancestor above him : but, when one is disabled by Parliament (without any attainder) to claim the dignity for his life, it is a personal disability for his life only, and his heir after his death may claim as heir to him, or to any ancestor above him."   There is a close analogy between that case and the present.  See also *Wheatley* v. *Thomas*, Lev. 74.

Without pursuing this discussion farther, we repeat, that to hold that any estate or interest remained in Charles S. Wallach after the confiscation and sale of the land in controversy would defeat the avowed purpose of the Confiscation Act, and the only justification for its enactment; and to hold that the joint resolution was not intended for the benefit of his heirs exclusively, to enable them to take the inheritance after his death, would give preference to the guilty over the innocent.  We cannot so hold.  In our judgment, such a holding would be an entire perversion of the meaning of Congress.

It has been argued that the proclamations of amnesty after the close of the war restored to Charles S. Wallach his rights of property.  The argument requires but a word in answer.

Conceding that amnesty did restore what the United States held when the proclamation was issued, it could not restore what the United States had ceased to hold. It could not give back the property which had been sold, or any interest in it, either in possession or expectancy. *Semmes* v. *United States*, 91 U. S. 21. Besides, the proclamation of amnesty was not made until Dec. 25, 1868.          *Decree reversed.*