620 F.2d 1026
 27 Cont.Cas.Fed. (CCH) 80,367, 6 Fed. R.
Evid. Serv. 696
UNITED STATES of America, Appellee,
v.
Ottavio F. GRANDE, Appellant.
UNITED STATES of America, Appellee,
v.
Gerald W. BERG, a/k/a Buzz Berg, Appellant.
UNITED STATES of America, Appellee,
v.
Andrew HAWTHORNE, Appellant.
UNITED STATES of America, Appellee,
v.
Edgar HAWTHORNE, Appellant.
UNITED STATES of America, Appellee,
v.
Pietro CASTAGNA, a/k/a Peter Castagna, Appellant.
 Nos. 78-5056 to 78-5059 and 78-5061.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 4, 1979.
Decided April 21, 1980.
As Modified on Denial of Rehearing and Rehearing En Banc May 29, 1980.
 
 Eugene Gressman, School of Law, University of North Carolina, Chapel Hill, N. C., for appellants.
 Ransome J. Davis, Baltimore, Md. (H. Russell Smouse, Baltimore, Md., on brief), for appellant Andrew Hawthorne.
 Wilbur Greenberg, Philadelphia, Pa., for appellant Edgar Hawthorne.
 Henry Belsky, Baltimore, Md. (Jana R. Barnett, Baltimore, Md., on brief), for appellant Pietro Castagna.
 Michael E. Marr, Baltimore, Md., on brief, for appellant Ottavio F. Grande.
 David D. Queen, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.
 Before WINTER and RUSSELL, Circuit Judges, and FIELD, Senior Circuit Judge.
 WINTER, Circuit Judge:
 
 
 1
 The appealing defendants, four demolition contractors and a former director of the Baltimore City department who was responsible for preparing, advertising, evaluating and supervising the city's demolition contracts, were all convicted on forty-five counts of a forty-eight count indictment charging them with various criminal offenses arising out of a scheme of collusive bidding on demolition contracts in Baltimore City.[1] The demolition contracts which were the object of collusive bidding were principally those let by the Department of Housing and Community Development between 1971 and 1975. The appellants raise twelve principal contentions applicable to some or all of them.
 
 
 2
 We affirm in part and reverse in part and remand for further proceedings.
 
 I.
 
 3
 Viewed in the light most favorable to the government, the evidence showed that within the period January 1968 to July 1976, there was intense redevelopment in Baltimore City, and demolition of outmoded and unusable buildings was a frequent occurrence. Virtually all demolition was done by private contractors at municipal expense through contracts let by the Department of Housing and Community Development, Division of Construction and Building Maintenance, of which defendant Ottavio F. Grande, was director. Grande's division prepared demolition contracts, fixed the specifications contained therein, evaluated bids, made recommendations for awards and supervised performance of the contracts once an award was made. Under city law, awards were made by the city's Board of Estimates to the lowest responsible bidder as a result of competitive bidding, after public advertisement for bids. With respect to some "emergency" demolition contracts, e. g., demolition to eliminate dangerous conditions resulting from fires, competitive informal bidding was used, with the award made by Grande to the lower bidder.
 
 
 4
 Dissatisfied with their margin of profit on contracts obtained by competitive bidding, the contractors who historically had done the city's demolition and wrecking work devised a scheme to ensure them a greater profit. Initially the group consisted of defendant Gerald W. "Buzz" Berg (Buzz Berg Wrecking Company), defendant Joseph Tuller (State Wrecking Company of Maryland), Charles E. Collison (Harford Contracting Company), Roland Larkin (Roland Larkin, Inc.), Julius Hoffman and Harry Milzman (Harry Hoffman & Sons, Inc.), C. Gordon Spielman (Charles J. Spielman, Inc.), and defendant Pietro Castagna (Castle Construction Company).[2] The conspiracy was later joined by defendants Andrew Hawthorne and Edgar Hawthorne (Robert L. Hawthorne, Inc.), who were Philadelphia contractors who desired to get Baltimore business.
 
 
 5
 The scheme was a simple one. Through information supplied by Grande as to the city's cost estimate on a contemplated project, the group could determine the maximum bid that could be made without causing all bids to be rejected and the project readvertised. With that knowledge, the members of the group would assign themselves turns to submit the "low" bid, with the other bidders either not bidding or bidding a higher amount. Grande was paid approximately five percent of each contract for which an award was obtained pursuant to the scheme.
 
 
 6
 Counts one through twenty-eight charged violations of mail fraud against Grande, Berg, Tuller and the Hawthornes. Counts twenty-nine through thirty-one charged Berg, Tuller and Andrew Hawthorne with being engaged in a pattern of racketeering activity and called for the forfeiture of their interests in their respective companies upon conviction of the charges against them. Counts thirty-two, thirty-three, thirty-five and thirty-six charged Grande with affecting interstate commerce by means of extortion from Larkin and Harford Contracting Company, Inc., and similar offenses were charged against Grande and Castagna jointly in counts thirty-four, thirty-seven and thirty-eight. Grande was charged with obstruction of justice by bribery in count thirty-nine and Berg with obstruction of justice by intimidation and threats of force in count forty. Finally, counts forty-one through forty-eight charged Grande with various income tax violations with respect to the sums paid him under the scheme to obtain contracts.
 
 
 7
 Other facts necessary to an understanding of the various contentions advanced by the defendants will be stated in the discussion of the contention to which they relate.
 
 II.
 
 8
 Collectively, defendants advance a myriad of arguments why the convictions of all or some of them should be reversed, with or without a new trial. We see no need to discuss each contention at length, and we will begin by commenting on those which we do not think warrant extended treatment.
 
 
 9
 A. We reject defendants' argument that, although their prosecution falls within the scope of federal jurisdiction, it improperly injects federal criminal power into areas of peculiarly local or state concern. This issue was decided implicitly in United States v. Caldwell, 544 F.2d 691 (4 Cir. 1976). See also the authorities cited and discussed in the panel opinion in United States v. Mandel, 591 F.2d 1347, 1357-58 (4 Cir. 1979), later withdrawn. Indeed, this is a stronger case in which to apply the mail fraud statute (18 U.S.C. § 1341), because in this case it can readily be inferred that, by reason of collusive bidding, Baltimore City and its citizens suffered actual financial injury. Not only were they deprived of good government, they were required to pay more for demolition when the "low" bid was artificially inflated than they would have been required to pay for demolition under contracts fairly entered into as the result of honest competitive bidding. Certainly we think that in general the evidence to support the existence of a scheme to defraud is compelling.
 
 
 10
 The thrust of § 1341 is upon misuse of the mails to defraud, not the regulation of state and municipal affairs. United States v. States, 488 F.2d 761, 767 (8 Cir. 1973), cert. denied, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212, cert. denied, 417 U.S. 950, 94 S.Ct. 3078, 41 L.Ed.2d 671 (1974). Defendants' use of the mails, principally to give notice to proceed on contracts for demolition, to send checks in full or partial payment under fraudulently obtained demolition contracts and to mail a bill from one of the contractors for work performed under one such contract are, in our view, sufficiently related to the scheme to defraud to bring defendants within the reach of § 1341. Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); United States v. Mandel, supra, at 1360 n.9; United States v. Brewer, 528 F.2d 492, 494 (4 Cir. 1975).
 
 
 11
 B. We reject also the argument of Berg and Andrew Harthorne that their convictions under counts twenty-nine and thirty-one must be reversed because legally they cannot be convicted both of mail fraud under § 1341 (charged in other counts) and conducting interstate business through a pattern of racketeering under 18 U.S.C. § 1962(c) as charged in counts twenty-nine and thirty-one. A premise of the argument appears to be the rejected notion that the Racketeer Influenced and Corrupt Organizations Chapter (RICO) of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961 et seq. applies only to organized crime in the classic "mobster" sense. See United States v. Campanale, 518 F.2d 352, 363 (8 Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). To the contrary, § 1961(1) defines "racketeering activity" merely to mean, inter alia, an act indictable under the mail fraud statute, § 1341, and defines "pattern of racketeering activity" as at least two acts of racketeering activity occurring within a stated time period.
 
 
 12
 Without detailing all of the elements of each crime, we think it clear that a conviction under § 1962(c) requires proof of elements not required to be proved to obtain a conviction under § 1341. See Iannelli v. United States, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The fact that the § 1341 counts in the instant indictment alleged more than was strictly required to be proved to obtain a conviction under that section, and the fact that these incidental facts were proved at the trial, cannot bar a prosecution and punishment under § 1962(c), which depended on proof of the additional facts to establish its additional elements. The Blockburger test looks to what elements of proof a statute requires to establish its violation, not what may be incidentally alleged and proved, 284 U.S. at 304, 52 S.Ct. at 182.
 
 
 13
 C. Defendant Berg argues that his conviction must be reversed because of prosecutorial vindictiveness and misconduct. In the district court, Berg claimed that the then United States Attorney, who in his official capacity had signed the indictment returned by the grand jury, had been the member of a law firm that had for many years represented Collison, an unindicted coconspirator and important government witness. In addition, the firm had represented a neighborhood improvement association, of which the United States Attorney's sister was an active and outspoken member, in a zoning dispute with Berg concerning his maintaining a pond and a helicopter landing pad on his property. Moreover, Collison had made a political contribution to the campaign of the United States Attorney when he had earlier run for elective political office.
 
 
 14
 The short answer to Berg's claim of prosecutorial vindictiveness is that the United States Attorney submitted to the district court, which denied Berg's motion to quash the indictment, an affidavit stating that he had recused himself from all prosecutorial decisions concerning Collison from the inception of the investigation, that he had no participation, contact or specific knowledge of the zoning proceedings concerning Berg, that he could recall no conversations with his sister or members of his former law firm concerning Berg and believed that none had occurred, and that in any event no such circumstances had any effect on any prosecutorial decisions concerning Berg. Additionally, the two assistant United States Attorneys who were in charge of the investigation which led to this case each made affidavit that, when the scheme became apparent to federal investigators and prosecutors, the United States Attorney recused himself from any and all decisions involving Collison and any agreements with Collison were made by them without the prior knowledge and concurrence of the United States Attorney. The affidavit of the United States Attorney and those of the two assistants were unrefuted.
 
 
 15
 On these facts, we see no evidence of vindictive or selective prosecution. Indeed, we are unable to perceive any evidence of an appearance of impropriety.
 
 
 16
 D. Although jurors were not sequestered throughout the trial, they were repeatedly admonished not to read anything about it. Near the end of the trial a daily newspaper of general circulation published an article concerning a subpoena issued by a grand jury to obtain the construction records of a division of Baltimore City headed by a certain Marco L. Palughi. In one paragraph of the twenty-six-paragraph article, it was reported that Mr. Palughi had been mentioned along with defendant Grande in the trial of another political figure who had been convicted of extortion. The defendant in that case was reported to have said that $10,000 taken for supplying city work was shared with Palughi and defendant Grande.
 
 
 17
 The article was brought to the attention of the district judge and defense counsel asked him to declare a mistrial, or, alternatively, to interrogate the members of the jury as to whether they had read it. The district judge declined both requests and his refusal is claimed to be reversible error.
 
 
 18
 We see no error. The district judge did instruct the jury again not to read "anything that touches on something that goes on in this case," and he repeatedly told them to come to him and tell him if they had read or been influenced by any outside publicity. At the close of his instruction, the judge asked the jurors if they understood, and the record indicates that the jurors nodded affirmatively. None of the jurors ever indicated having read or been influenced by any articles. Even if the article was prejudicial, we think that the district judge did not abuse his discretion by the manner in which he dealt with the problem. See United States v. Jones, 542 F.2d 186, 194-95 (4 Cir.), cert. denied, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976).
 
 
 19
 E. Among numerous other convictions, defendant Grande was convicted of three violations of the Hobbs Act, 18 U.S.C. § 1951 (obstructing commerce by obtaining money wrongfully under color of official right). Defendant Castagna was charged and convicted of aiding and abetting Grande in these offenses. Both Castagna and Grande contend that the evidence was not legally sufficient to convict them. A large part of this contention is that they could not be convicted of violating § 1951 because the proof was legally insufficient to show that they acted under "color of official right" and there was no evidence that Collison of Harford Contracting Company, Inc., or Larkin of Robert Larkin, Inc., from whom money was allegedly extorted, feared either of them.
 
 
 20
 There is no merit in this contention. The proof showed that money was paid by both Collison and Larkin to Grande and that Castagna was the conduit for payment. We think the evidence sufficient for the jury to find that payment was made to Grande for his supplying cost data on bids and his services in evaluating bids and recommending awards. Even though Grande did not threaten Collison or Larkin, or otherwise put them in fear, we think that he did obtain money from them "under color of official right" because he held public office and it must have been apparent to Collison and Larkin that he misused that office to favor them. Nothing more is required to support a conviction under 18 U.S.C. § 1951. See United States v. Price, 507 F.2d 1349 (4 Cir. 1974); United States v. Braasch, 505 F.2d 139 (7 Cir. 1974); United States v. Kenny, 462 F.2d 1205 (3 Cir. 1972). Although Castagna held no public office, the proof showed that he was properly convicted as an aider and abettor to Grande under 18 U.S.C. § 2. Indeed, on one occasion when Grande demanded payment from Collison at a time when Collison lacked the requisite cash, Grande arranged for Castagna to pick up a check the next day.
 
 
 21
 F. All defendants contend that their convictions should be reversed because of a violation of the Jencks Act, 18 U.S.C. § 3500 with respect to the witness Larkin. As to this witness, the government supplied defense counsel with a transcript of Larkin's testimony before the grand jury but excised therefrom approximately three and one-half pages. After an in camera inspection, made while Larkin was testifying, the district court sustained nondisclosure for the reasons set forth in a memorandum opinion. Defendants argue that, in making its ruling sustaining the suppression, the district court applied the wrong legal standard. We need not consider the point, however, because our examination of Larkin's direct testimony and the excised grand jury testimony persuades us that the excised material did not relate to Larkin's direct testimony within the meaning of § 3500. See United States v. Derrick, 507 F.2d 868, 870-71 (4 Cir. 1974). It follows therefore that whatever reason motivated the district court, it decided the issue correctly.
 
 
 22
 We turn now to the contentions which merit more extended discussion.
 
 III.
 
 23
 Defendant Edgar Hawthorne (defendant Edgar) was indicted and convicted on a single charge of aiding and abetting mail fraud with respect to an emergency demolition of the Stieff Piano Building, which had been heavily damaged by fire. Defendant Andrew Hawthorne, (defendant Andrew) was convicted on that count, eight others charging mail fraud with respect to other demolition contracts and one count of conducting interstate business through a pattern of racketeering activity. Jointly they advance a number of contentions why their convictions should be reversed. They assert prejudicial joinder and an abuse of discretion in the denial of a severance, the prejudicial admission into evidence of Government Exhibit 128, and a denial of due process in the district court's refusal to permit them to interrogate a government witness about the exhibit. Defendant Edgar contends that the evidence was legally insufficient to convict him; defendant Andrew makes no like claim, aside from the contention that his convictions should be reversed because exhibit 128 was improperly admitted. We think that the evidence was legally sufficient to convict defendant Edgar, and we will deal with that question first. Next we will discuss the remaining contentions with respect to both defendants, except the joinder and severance contentions which are rendered largely moot in view of our conclusion that these defendants' convictions must be reversed and they must be awarded new trials.
 
 A.
 Edgar Hawthorne
 
 24
 The alleged vulnerability of the government's case against defendant Edgar lies in the proof of his participation in the scheme to defraud of which the mailing was a part. The emergency demolition of the Stieff Piano Building resulted from a fire that did substantial damage to the building and rendered it hazardous and unsafe. It was the government's theory that Robert L. Hawthorne, Inc. was awarded the demolition contract as a result of collusive bidding, that defendant Andrew was the individual who was the principal actor on behalf of the company and that he was aided and abetted by defendant Edgar.
 
 
 25
 The government's evidence showed that, after the building was ravaged, a representative of Baltimore City went to a site, approximately five blocks from the Stieff building, where Collison of Harford Contracting Company was working to ask Collison to lend assistance. Collison's crane, however, had broken down earlier in the day and he lacked the equipment to help. As a consequence, aid from Robert Hawthorne, Inc. was sought, and it moved a crane in that night and worked with the fire department.
 
 
 26
 Collison testified that the next morning he was called and asked to go to the Stieff building and bid on the remaining work to be done. When he got there he found defendants Edgar and Andrew together with defendant Tuller of State Wrecking Company of Maryland. All were asked by Grande, who was also present, to bid informally on the site, and the contract was to be awarded on the site by Grande. Collison testified with respect to the bidding as follows:
 
 
 27
 I do not remember if it was Mr. Hawthorne or Mr. Grande that said "let Hawthornes have it, being that they are already there, and bid over a certain price."
 
 
 28
 QUESTION: Who was there when it was said?
 
 
 29
 ANSWER: When it was bid Mr. Tuller was there, I was there, Mr. Edgar and Mr. Andrew Hawthorne. I cannot place anybody else.
 
 
 30
 Coupled with this testimony is documentary evidence which shows that defendant Edgar signed the bid form on behalf of his company, bidding $82,000 to do the necessary work. The two other bids were higher. Indeed the bid form signed by defendant Edgar recites that he negotiated the low bid price and agreed that the cost of the emergency work performed by his company the day before would be included in the $82,000 bid that his company made.
 
 
 31
 In the light of this evidence, we have no hesitancy in concluding that the evidence was legally sufficient to permit the jury to find beyond a reasonable doubt that defendant Edgar knew that there was a scheme of rigged bidding, the purpose of which was to award the demolition contract to Robert Hawthorne, Inc. at an agreed upon price, that he associated himself with it, that he participated in it as something which he wished to bring about, and that he sought by his action to make it succeed.
 
 B.
 Prejudicial Joinder; Severance
 
 32
 The claims of both defendants that there was misjoinder of the charges against them and an abuse of discretion in denying them severance are largely mooted by our conclusion, expressed hereafter, that their convictions must be reversed and new trials awarded. As a consequence, we need not discuss them. The only issue in this respect which warrants any mention is the claim that the proof showed that there was not a single conspiracy during the period January 1, 1968 through July 2, 1976, but rather at least two conspiracies one from January 1, 1968 to May, 1973, and the other from May, 1973 to the end of the conspiracy period. As we view the evidence, without detailing it, the jury could properly find a single conspiracy as the indictment alleged even though it is clear that the defendants Hawthorne did not join the conspiracy until May, 1973. We state this conclusion for the effect, if any, that it may have on the admissibility of evidence in the event of a retrial. We fully recognize, however, that defendants Hawthorne would be entitled to an instruction limiting the jury's consideration of evidence to determine their guilt to that of events and actions occurring subsequent to the time that they joined a scheme to defraud.
 
 C.
 Exhibit 128; Denial of Cross-Examination
 
 33
 Exhibit 128 was an invoice of Robert Hawthorne, Inc. to Collison's demolition company, Harford Contracting Company, in connection with the "Whiting-Turner job." Among various billed items on the document is the unexplained figure "$2,000." The invoice was paid, and the incriminating inference to be drawn from it is that the $2,000 charge represented a payoff from Collison to the Hawthornes for "laying off" that job.
 
 
 34
 One of the government's principal witnesses was Collison. He testified to a general pattern within the scheme of rigged bidding for the successful bidder (the bidder whose turn it was to get an award) to make a payment to other members of the scheme, who either submitted no bid or who purposely bid higher, to compensate them for not obtaining the contract. In this testimony he alluded to the Whiting-Turner job. On cross-examination, counsel for the defendants Hawthorne did not interrogate Collison about the nature and cost of services performed by the Hawthorne Company on that job. The district court excused Collison at the conclusion of his testimony, but agreed, albeit reluctantly, that Collison would be subject to recall by the defendants at a later date.
 
 
 35
 After the government's case was concluded, counsel for defendant Andrew did explore the details and cost of the work performed by the Hawthorne Company for Collison's company on the Whiting-Turner job. This evidence was adduced from a certain George Palmer who was a crane operator for the Hawthorne Company during the indictment period. At the conclusion of the government's cross-examination of Palmer, the government sought to introduce exhibit 128. This was the first mention of the exhibit. When counsel for defendant Andrew indicated that he would object, the government withdrew its request that the exhibit be admitted into evidence and said that it would offer the exhibit at a later time.
 
 
 36
 The next two witnesses to testify were clerical employees of Robert Hawthorne, Inc. called by defendant Edgar to testify about bills for jobs other than the Whiting-Turner project. On cross-examination the government made each its own witness and posed questions about the exhibit. In summary, the government elicited testimony that neither witness prepared the bill, nor could either witness state who had prepared the bill. One testified, however, that the bill looked like a Hawthorne bill and had a cost breakdown similar to Hawthorne bills although the exhibit lacked the initials at the bottom of the page, indicating the preparer, customarily used on Hawthorne bills.
 
 
 37
 After the testimony of the two clerks, the government offered exhibit 128 in evidence. Counsel for defendant Edgar objected and, in the course of the colloquy between counsel (joined in by counsel for defendant Andrew) before the district court ruled, the prosecutor called attention to the correlation between the unitemized figure of $2,000 on the bill and the previous testimony of Collison that he had paid the Hawthorne Company $2,000 to lay off of the Whiting-Turner job. Counsel for defendant Edgar said in reply that the exhibit should have been offered in connection with the testimony of Collison because Collison could then have been cross-examined about the charge. Counsel added that if the exhibit was admitted, he wished to recall Collison and cross-examine him about the bill. Overruling the objection and rejecting the further comments of counsel for defendant Andrew in opposition to admission, the district court admitted exhibit 128 into evidence. Counsel for defendant Edgar then moved to call Collison for "sur-rebuttal," but the district court summarily denied his request. The motion was renewed the next day before closing arguments began, but it was again denied.
 
 
 38
 In its opening summation, the government did not refer to exhibit 128 or refer to the Whiting-Turner job. But in closing, purportedly in response to an attack on Collison's credibility made by counsel for another defendant, the government argued that exhibit 128 supported Collison's credibility in that it showed that Collison had paid off Robert Hawthorne, Inc. and that therefore Collison testified truthfully when he stated that his company had paid off other companies for their part in rigging the bidding. Following this argument, counsel for defendant Edgar made a final objection to exhibit 128 and requested permission to address the jury concerning it.[3] The objection and the motion were both overruled.
 
 
 39
 The Hawthorne defendants both contend that the exhibit was improperly admitted into evidence, primarily because it was not sufficiently authenticated. We reject this argument. Federal Rule of Evidence 901(a) states the requirement of authentication as a condition, precedent to admissability is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims," and, as an illustration of authentication, Rule 901(b) states that "(a)ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances" may constitute authentication. The testimony of one of the clerical employees of the Hawthorne company that the bill was in the form customarily used, coupled with other evidence that the bill was paid by Collison, that it purported to be for a job which was an actual one and that the itemized charges were at a rate agreed upon by the parties, was sufficient, we think, to authenticate it, notwithstanding the witnesses' inability to identify its preparer.
 
 
 40
 We do think, however, that there was reversible error in the district court's refusal to permit further cross-examination of Collison with respect to exhibit 128. It will be remembered that Collison was excused as a witness, subject to recall, before the government undertook to introduce the exhibit into evidence. When the exhibit was admitted into evidence, an explanation of it by Collison became highly relevant, especially in view of Collison's reference to the Whiting-Turner job in his testimony about payments to contractors to compensate them for not engaging in competitive bidding. Of course, had Collison been recalled to provide such an explanation, he might have confirmed that the $2,000 item on exhibit 128 was a payment of this kind; but he was not recalled and we cannot say with certainty that this would have been his testimony. Thus, we cannot say that the district court's refusal to permit him to be recalled, if error, was at most harmless error. Rather, we conclude that under the circumstances that we have detailed the refusal was reversible error because it amounted to a denial of due process.
 
 
 41
 The due process clause unquestionably guarantees to a defendant the right to rebut a case proved against him, and this right in turn includes the right to cross-examine the government's witnesses whose testimony incriminates him and to present evidence in his own behalf. That right was denied here. As the subsequent argument to the jury showed, exhibit 128 was an important part of the government's case against the defendants Hawthorne. It directly related to a count in which defendant Andrew was named as a defendant. It also related to the count in which defendant Edgar was charged, and to other counts in which defendant Andrew was named, because of its effect to bolster the credibility of Collison, whose testimony was an essential part of the government's case with respect to all of the counts in which the Hawthornes were charged. We accept that the denial of due process was not deliberate. It stemmed from the fact that the exhibit came into evidence after the government's case was closed and the significance of the exhibit was not argued to the jury until the government's closing argument. But the fact is that these defendants were denied the opportunity to interrogate Collison, either by cross-examination of him as a government witness or calling him as their own adverse witness, about the documentary proof on which the government relied to bolster his credibility, notwithstanding that there had been a reservation of their rights to examine him further after their initial cross-examination.
 
 
 42
 Thus, we conclude that defendant Edgar Hawthorne is entitled to reversal and a new trial with respect to his conviction under count twenty-one, and defendant Andrew Hawthorne is entitled to reversal and a new trial with respect to his nine convictions under counts eighteen to twenty-two and twenty-four to twenty-seven, all inclusive. Because the convictions of defendant Andrew Hawthorne for mail fraud were the predicate for his conviction under count thirty-one, his conviction under count thirty-one must also be reversed and a new trial awarded.
 
 IV.
 
 43
 Among other convictions, defendant Berg was convicted under count forty of obstruction of a criminal investigation in violation of 18 U.S.C. § 1510. That section authorizes criminal punishment of anyone who "willfully endeavors by means of . . . intimidation, or force or threats thereof to obstruct . . . or prevent the communication of information (of violation of a federal criminal statute) to a criminal investigator . . . ." "Criminal investigator" is defined to mean any person authorized by the United States to investigate violations of federal criminal laws. Berg contends that, under a proper construction of the proof required to support a conviction under § 1510, the proof adduced by the government in support of count forty was legally insufficient to permit the jury to find him guilty. We agree. Berg also contends that the proof adduced by the government was so inflammatory and prejudicial that his other convictions were impermissibly tainted, and that they too should be reversed and a new trial awarded. We reject this argument.
 
 
 44
 Count forty arose out of threats made by Berg to Collison. Viewed in the light most favorable to the government, the evidence showed that Berg met Collison, at Berg's request, at a dump. When the two were alone, Berg showed Collison a magazine article describing the shooting in Detroit of an executive of a wrecking company who was to have been a key prosecution witness in a bribery case. Berg supplemented the showing by the statement: "Look what happened to somebody in Detroit that talked." Aside from any inferences that can be drawn from the event itself, the government offered no proof to show either that Berg knew that Collison was a government informer at the time of the alleged implied threat, or that the FBI or any other federal criminal investigating agency was investigating the bidding scheme. The incident occurred on or about November 10, 1976. The indictment was not returned until January 24, 1977.
 
 
 45
 Section 1510 was enacted in 1967 to extend the protection, theretofore granted to witnesses and jurors in judicial, administrative, and congressional proceedings, to informants and potential witnesses who participate in a criminal investigation or inquiry before an indictment is returned or a criminal information filed. The language of the statute employs the word "willfully" in proscribing intimidation of one who seeks to impart information to a federal investigator about the commission of a federal crime, and the legislative intent sought to be expressed by the use of the word is set out in H.R.Rep.No.658, 90th Cong., 1st Sess. (1967) reprinted in (1967) U.S.Code Cong. & Admin.News, pp. 1760, 1762:
 
 
 46
 Under the act the word "wilfully" (sic) is used relative to prohibitive acts which would constitute a crime, namely, bribery, misrepresentation, intimidation, or physical force or threats of physical force. The word "willfully" as used here means proceeding from a conscious motion of the will. It means designedly or intentionally and does not include an accidental or involuntary act. Being (a) criminal statute, the required criminal scienter is a necessary element of the crime. For example, if a person does not know that the investigator is a federal investigator, an act which would normally be in violation would not be so because of the lack of the scienter as to the identity of the investigator. (Emphasis added).
 
 
 47
 We read this legislative history to articulate a congressional intention that one may be found to have violated § 1510 only upon proof beyond a reasonable doubt, inter alia, that the person who was intimidated, threatened, or harmed was about to communicate information to another known by the accused to be a federal criminal investigator. Our reading of this requirement of § 1510 comports with the decisions of other courts. See United States v. San Martin, 515 F.2d 317, 320 (5 Cir. 1975); United States v. Lippman, 492 F.2d 314, 317 (6 Cir. 1976); United States v. Williams, 470 F.2d 1339, 1343 (8 Cir. 1973); United States v. Kozak, 438 F.2d 1062 (3 Cir. 1971).
 
 
 48
 The evidence against Berg, as we view it, was insufficient to prove knowledge that Collison was conveying or about to convey information about the illegal bidding scheme to a federal investigator. At most, it provided a basis from which to infer that Berg may have suspected that Collison was cooperating or possibly would cooperate in an investigation by law enforcement officials of the bidding scheme and that Berg sought to deter him; there is nothing to indicate that Berg knew that Collison was giving information to a federal investigator. Thus, we conclude that Berg's conviction on count forty must be reversed.
 
 
 49
 We are not persuaded, however, that the government's evidence offered under count forty was so inflammatory and prejudicial that all of Berg's other convictions should be reversed. While the evidence of the meeting with Collison, if believed, might serve as a basis from which the jury could conclude that Berg was not a pleasant person, we do not think, as he argues, that it depicted him as a stereotype hoodlum, prone to kill. We do not believe that the passions of the jury were inflamed to the point that the jurors were unable to follow the court's instructions that they were to view and weigh objectively the evidence relating to each of the other counts in which Berg was charged.
 
 V.
 
 50
 Immediately after returning its verdict finding Berg guilty of racketeering under 18 U.S.C. § 1962, the jury rendered a special verdict to the effect that Berg had a fifty percent interest in the Buzz Berg Wrecking Company, Inc. That verdict was premised on Berg's stipulation as to the amount of his interest in the company. The district court then granted the government's motion for an injunction and entered an order restraining Berg from transferring, concealing, dissipating or otherwise disposing of or altering his interest in the company. The purpose of the order was to permit the United States to inventory and evaluate the assets of the company preliminary to the forfeiture of Berg's interest pursuant to 18 U.S.C. § 1963(a). That statute provides that one convicted of violating 18 U.S.C. § 1962 shall be fined not more than $25,000 or imprisoned not more than twenty years, or both
 
 
 51
 and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted or participated in the conduct of, in violation of section 1962.
 
 
 52
 Berg attacks the validity of the forfeiture provisions of § 1963 on the grounds that they violate the fifth and eighth amendments. The argument that the statute denies due process depends principally upon the subsidiary assertion that the statute contravenes the spirit, if not the letter, of article III, § 3, cl. 2 of the Constitution ("no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted").[4] Article III, § 3, cl. 2 of the Constitution was supplemented by the first congress, which enacted 1 Stat. 112, 117 (1790), presently codified as 18 U.S.C. § 3563. Currently, that section reads: "No conviction or judgment shall work corruption of blood or any forfeiture of estate." We would agree with Berg that if § 1963 revives "forfeiture" of estate as that concept was expressed in the Constitution it is almost certainly invalid because of the irrationality of a ruling that forfeiture of estate cannot be imposed for treason but can be imposed for a pattern of lesser crimes. But we do not think that, when viewed in the light of the historical purpose of article III, § 3, cl. 2 and the 1790 statute, § 1963 revives the proscribed "forfeiture of estate." We reach this conclusion despite indications in the legislative history of § 1963 that Congress believed that the forfeiture provision would repeal the 1790 statute by implication.[5]
 
 
 53
 Under early English law, the complete forfeiture of all real and personal property followed as a consequence of conviction of a felony or treason. In fact, the term "felony" was defined under English law as "an offence which occasions a total forfeiture of either lands or goods or both." 1 J. Bishop, Commentaries on the Criminal Law 382-83 (1856 ed.). In addition, when convicted of treason or a felony, the defendant's "blood was corrupted" so that nothing could pass by inheritance through his line. See generally 1 J. Bishop, Commentaries on the Criminal Law 581-83 (1882); 2 Kent's Commentaries on American Law 385-87 (1836 ed.). This sweeping imposition of forfeiture, which disinherited men because they were kindred to felons, may not have been wholly irrational in a feudal society in which land and property were ultimately held through the crown, and the commission of a felony (particularly treason) constituted a serious breach of the original bond of allegiance to the king, the offender's feudal lord, and to society. See generally 2 J. Story, Commentaries on the Constitution of the United States 178-80 (1858 ed.). As English society changed, however, the broad forfeitures imposed at common law were modified by statute.
 
 
 54
 At the time of the adoption of the Constitution, it appears that forfeiture of estate and corruption of blood were still imposed in England for some of the more serious felonies and for treason. In 1814, the English Parliament abolished corruption of blood as a punishment for all felonies except murder (although forfeiture of estate for serious felonies seems to have survived for some time thereafter), and a statute limiting forfeiture for treason to the life of the offender was enacted in the early nineteenth century.[6] 2 Kent's Commentaries on American Law 473-74 (1854 ed.).
 
 
 55
 Forfeiture of estate found little favor in the American Colonies. Although forfeiture practices varied substantially from colony to colony, see generally 1 J. Bishop, Commentaries on the Criminal Law 585-86 (1892 ed.); Note, "Bane of American Forfeiture Law Banished at Last?," 62 Cornell L.Rev. 769, 776-77 (1977), they were never as severe as those prevalent in England during the American colonial period. In 1787, the imposition of forfeiture of estate and corruption of blood for treason was banned by the Constitution. Three years later, the first congress abolished that penalty for all convictions and judgments. For judicial recognition of this legal history, see Wallach v. Van Riswick, 92 U.S. 202, 208-11, 23 L.Ed. 473 (1876).
 
 
 56
 The significance of this historical background is that nothing contained therein suggests that either article III or the 1790 statute was intended to prohibit anything other than corruption of blood or forfeiture of estate as imposed at common law. To the contrary, it is clear that both article III and the subsequent statute contemplated broad forfeitures incident to attainder as a traitor or felon, i. e., total disinheritance of one's heirs or those who would be one's heirs and forfeiture of all of one's property and estate. See, e. g., 1 J. Bishop, Commentaries on the Criminal Law 583 (1882 ed.); 2 J. Story, Commentaries on the Constitution of the United States 179-80 (1858 ed.). In short, the belief of the 91st Congress (as first suggested by the Department of Justice) that RICO's forfeiture provision would repeal the 1790 statute by implication is without legal or historical support.
 
 
 57
 In addition to the fact that article III, § 3, cl. 2 and § 3563 were designed to restrict broader forfeiture than that established by § 1963(a), the law has always recognized the constitutional validity of forfeiture of the instruments of the crime. See, e. g., Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); United States v. United States Coin and Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1970). Section 1963(a) manifestly seeks to accomplish just that: it declares forfeitable an interest in property in an enterprise operated in violation of § 1962. As the Supreme Court has recognized, in rem forfeitures, though nominally against inanimate objects, impose penalties upon persons, United States v. United States Coin and Currency, supra, at 721-22, 91 S.Ct. at 1045, and the fact that the proceeding is in personam rather than in rem seems of little significance. United States v. Huber, 603 F.2d 387 (2 Cir. 1979); United States v. Thevis, 474 F.Supp. 134, 140-41 (N.D.Ga.1979). The effect of a forfeiture under § 1963 is the functional equivalent of a forfeiture in rem.
 
 
 58
 Nor, for the reasons stated and those which follow, do we perceive any violation of the eighth amendment. In this regard, we agree with United States v. Huber, supra, and United States v. Thevis, supra. Although § 1963 authorizes an in personam forfeiture procedure, it does not, as we have shown, revive any penalty long in disuse, and it is not unusual when viewed in the light of the penalties provided for property used in liquor violations (18 U.S.C. § 3615), property used in connection with illegal bribes (18 U.S.C. § 3612), property used in illegal gambling (18 U.S.C. § 1082), and property used in connection with narcotics violations (49 U.S.C. § 782). See generally Calero-Toledo v. Pearson Yacht Leasing Co., supra ; Dobbins v. United States, 96 U.S. 395, 24 L.Ed. 637 (1878). The magnitude of the forfeiture is directly keyed to the magnitude of the defendant's interest in the enterprise conducted in violation of law. Accordingly, we conclude that it is not cruel and unusual in the constitutional sense.
 
 
 59
 We hold, therefore, that § 1963(a) is not invalid under the fifth and eighth amendments.
 
 VI.
 
 60
 In the light of what we have said, we reverse the conviction of defendant Edgar Hawthorne under count twenty-one of the indictment and those of defendant Andrew Hawthorne under counts eighteen to twenty-two, twenty-four to twenty-seven (all inclusive) and count thirty-one of the indictment and award them a new trial. We reverse the conviction of defendant Berg under count forty of the indictment and direct that the district court enter a judgment of acquittal. In all other respects the judgments of the district court are affirmed.
 
 
 61
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 Three counts were withdrawn from the jury at the close of the government's case. Joseph Tuller, one of the demolition contractor defendants who was convicted, did not appeal
 
 
 [2]
 Collison, Larkin, Hoffman, Milzman and Spielman were not indicted, and at trial they testified as government witnesses
 
 
 [3]
 The record is less than exact as to whether both of the defendants Hawthorne have preserved their right to object to the admission of exhibit 128 and the district court's failure to permit Collison to be recalled. It is certain that defendant Edgar did, but it does not appear that defendant Andrew formally joined in the request to recall Collison or to address the jury on the subject of exhibit 128. There was, however, a statement by the district court at the beginning of the trial that every defendant would be deemed to join in every motion unless he specifically asked to be excluded. In the defendants' briefs in our court, both Andrew and Edgar join in the arguments concerning exhibit 128, the refusal to permit Collison to be recalled and the refusal to permit additional argument to the jury. Because it is clear that defendant Edgar preserved his rights, we address the issues on their merits. Even if defendant Andrew did not preserve any objections, we think that our conclusion that defendant Edgar's constitutional rights were violated would compel a conclusion that as to defendant Andrew there was "plain error." Again, from the briefs, it is certain that none of the other defendants make any claim that they are entitled to reversal on any of these grounds. Thus, we will treat the issues as raised only by both Hawthorne defendants and not raised by any other party
 
 
 [4]
 Berg also argues that because forfeiture results from conviction for so many differing types of racketeering activity, all as defined in 18 U.S.C. § 1961(a), the statute is overly broad and vague. This argument need not concern us further because the courts to which it has been presented have uniformly rejected it; and we agree. See, e. g., United States v. Huber, 603 F.2d 387, 393 (2 Cir. 1979); United States v. Hawes, 529 F.2d 472, 479 (5 Cir. 1976); United States v. Campanale, 518 F.2d 352, 364 (9 Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); United States v. Parness, 503 F.2d 430, 441-42 (2 Cir. 1974); United States v. Cappetto, 520 F.2d 1351, 1357-58 (7 Cir. 1974), cert. denied, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975)
 
 
 [5]
 The legislative history of § 1963's forfeiture provision consists almost in its entirety of a letter from then Deputy Attorney General Richard Kleindienst to the chairman of the Senate Judiciary Committee's Subcommittee on Laws and Procedures. The letter, which was relied on by the committee as the definitive explanation of § 1963(a), asserted that the concept of forfeiture in § 1963 differed from existing forfeiture provisions in that the latter were in rem while § 1963 proceeded in personam. Section 1963 was described as being derived from the early common law whereby a party convicted of treason or certain felonies forfeited his goods and chattels to the crown. See The Palmyra, 12 Wheat. 1, 25 U.S. 1, 6 L.Ed. 531 (1827). This concept, the letter continued, was abolished by statute so that the enactment of § 1963(a) would constitute a partial repeal of 18 U.S.C. § 3563 by implication. S.Rep.No.617, 91st Cong., 1st Sess., 79-80, 124-25 (1969). U.S.Code Cong. & Admin.News 1970, p. 4007
 The views of the then Deputy Attorney General have been noted in both United States v. Rubin, 559 F.2d 975, 991 n.15 (5 Cir. 1979), and United States v. Huber, 603 F.2d 387, 396 (2 Cir. 1979).
 
 
 [6]
 It was not until 1870 that corruption of blood and forfeiture of estate were abolished for treason and all felonies. At that time, according to Bishop, "milder forfeitures" were substituted for some offenses. 1 J. Bishop, Commentaries on the Criminal Law 585 (1892 ed.). The fact that the English Parliament believed that it could abolish forfeiture of estate and corruption of blood and at the same time impose narrower in personam forfeitures as criminal penalties is itself supportive of the position that "forfeiture of estate" means something other than the limited forfeiture imposed by § 1963